UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Michelle R., | ) | |
| | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50061 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|    *Defendant*. | ) | |

**MEMORANDUM OPINION AND ORDER**[1]

Plaintiff is seeking Social Security disability benefits based on some physical impairments (fibromyalgia and back problems), but her mental health impairments are the primary grounds for her claim. Anxiety is the predominant problem. Plaintiff states that she gets overwhelmed and distracted, making it hard to complete the many household and childcaring tasks she believes are her responsibility. She has cried during many doctor and therapy visits. The ALJ agreed that Plaintiff suffers from anxiety and other problems but found that she had shown improvement since 2015 as a result of consistent counseling and medication and therefore could do a limited range of jobs that would accommodate her limitations. Plaintiff's principal argument for a remand is that the ALJ erred in the listing analysis by not considering the opinion of John Benton, her social worker therapist.

### BACKGROUND

The Court will not summarize all the medical or biographical history. Set forth below are a few key facts to provide an initial framework:

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c).

- Plaintiff's last full-time work was in 2010.
- In February 2015, she began treatment at Rosecrance. Her primary therapist was Mr. Benton, but she saw others there and consulted occasionally with a psychiatrist for medication management.
- In October 2015, she filed Title II and XVI disability applications.
- On January 4, 2016, she completed the Adult Function Report. Ex. 4E. The ALJ cited to this report several times.
- On February 1, 2016, Plaintiff was examined by psychologist Peter Thomas, a consultative examiner, who prepared a report. Ex. 7F.
- On December 11, 2017, Mr. Benton completed a three-page medical questionnaire. Ex. 21F. This is the key document from Plaintiff's perspective.

At the administrative hearing, on January 3, 2018, Plaintiff's counsel gave the following opening statement:

> I believe that the files that we have, in particular, the psychiatric treatment with [Rosecrance] evidenced that my client meets or equals listings 12.04 and/or 12.06. 12.06 might be actually more appropriate based on the anxiety. In the brief I did try to go through and mention any time that I saw an examination that the examinee has noted that she was, you know, either tangential or exhibited racing thoughts, and I think those are consistent with 12.06. So that's my position on this case.

R. 38. Plaintiff then testified, stating that she was 43 years old, 5' 7" tall, and weighed 320 pounds. She was married with three children (ages 4, 12, and 13). The family lived off her husband's salary.

The ALJ then asked about Plaintiff's work history, covering several jobs going back to 2003. These included a two-and-half-year stint in the accounting department of a bank and a three-month job working for the census. Plaintiff's most recent job was a part-time job selling 31 Bags. After these questions, the ALJ asked Plaintiff why she could not work. She answered:

> I have a lot of problems with concentrating and I lose trend of thought and I try really hard to get it back but I don't. And I've been having a lot of problems with my back and it doesn't go away and I've tried therapies but it's not helping but the biggest [] part is trying to keep my thoughts together to function and it's just not happening.

R. 46.

Regarding the back problems, Plaintiff testified that she has spasms and that her doctors were still trying to figure out what was going on. She was taking Gabapentin, and previously tried Tramadol, but neither helped. The ALJ asked whether the back problems were related to the fibromyalgia, and Plaintiff stated that her doctors were trying to figure that out and thought they were "probably related." *Id.* Plaintiff stated that she also had some shoulder problems. The ALJ asked about statements indicating that the physical pain was related to the anxiety. Plaintiff agreed there was a connection. R. 47. She stated that she was taking Topiramate, and other medications. They helped somewhat, but she added a caveat: "it's just I want a medicine or a therapy that makes [the anxiety] go away and my psychiatrist said there is no cure." *Id.*

Plaintiff testified that she does drive but cannot drive longer than 25 to 30 minutes at a time. The ALJ asked whether she had help around the house taking care of the children. Plaintiff stated that her husband and daughter "help a lot." R. 48. The ALJ asked if she fed her three children, and Plaintiff stated that her husband fed the youngest daughter and the two older children took care of themselves and made sandwiches. Plaintiff spent a portion of the daytime hours in bed pretty much every day.

Plaintiff's counsel then took over the questioning. The first part of this examination explored Plaintiff's problems with worrying too much. After this exchange, which was the bulk of the questioning, counsel asked about a few other matters, including Plaintiff's fibromyalgia. Plaintiff testified that her main treatment was the counseling at Rosecrance but that she also saw a psychiatrist every two months. Counsel then asked Plaintiff to briefly explain some trauma from her childhood. (This was a reference to childhood sexual abuse allegedly from Plaintiff's grandfather.) Plaintiff testified that this experience molded her and "ruined" her and "played into" her current anxiety. R. 58-59. Counsel asked a final general question whether there was

3

anything else. Plaintiff stated that "there's other factors that add to [her] anxiety." R. 59. She mentioned that she had an autistic son who added "a lot of extra anxiety" and that "there's nothing I can do to make that situation better." R. 59.

On April 13, 2018, the ALJ found Plaintiff not disabled. At Step Two, the ALJ found that Plaintiff had the severe impairments of bipolar and anxiety disorder, osteoarthritis/fibromyalgia, and morbid obesity. At the end of the Step Two discussion, the ALJ summarized her findings, stating as follows about the mental impairments:

> Throughout her treatment records, claimant consistently complains of being overwhelmed by family responsibility and is noted as doing too much for her family, without delegating and setting appropriate boundaries. While it is clear that she experiences a number of situational stressors that impact her anxiety levels, she also demonstrates an ability to complete a wide range of daily activity both inside and outside of her home, interacting in the community through church, school activities and a small home business.

R. 20. At Step Three, the ALJ found that Plaintiff did not meet any listings. In the RFC analysis, the ALJ found that Plaintiff could do light work subject to physical and mental limitations.

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Accordingly, the reviewing court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5-7 (N.D. Ill. Oct. 29, 2014).

## DISCUSSION

Plaintiff raises three main arguments for remand. The first and longest argument is that the ALJ erred in the listing analysis. The central claim in this argument is that the ALJ failed to consider Mr. Benton's opinion as part of this analysis. The second argument, about half as long, attacks the credibility analysis, and the final argument, less than a page, discusses the physical problems. The Court concludes that a remand is required based on the first argument, thus making it unnecessary to address the remaining two.

The Court's decision to remand is based on a discrete but important error, one that can be explained in relatively short order. To recap pertinent background facts, the ALJ found that Plaintiff did not meet Listing 12.06 (for anxiety), finding specifically that she did not have marked limitations in any of the four Paragraph B criteria. To qualify as disabled, she would have to show marked limitations in at least two categories. Plaintiff argues here that she had marked limitations in "understanding, remembering, or applying information" and in "concentrating, persisting, or maintaining pace." Plaintiff's Brief at 7, Dkt. 14. The Court

therefore will limit the discussion to just those two categories. The ALJ found that Plaintiff's limitations were, respectively, mild and moderate.[2]

In Mr. Benton's questionnaire, he opined that Plaintiff had marked limitations in these categories. R. 1272. Plaintiff argues that the ALJ should have considered these findings in the listing analysis. She acknowledges that, later in the RFC analysis, the ALJ generally discussed Mr. Benton's overall opinion, giving several rationales for why it deserved only partial weight. However, in that discussion, the ALJ still did not discuss the specific Paragraph B findings.

Plaintiff is correct in these observations. But as the Commissioner points out, the ALJ provided an explanation for why she ignored Mr. Benton's opinion in the listing analysis. The reason is simple—she believed she was not *allowed* to do so. This is thus not a case where the ALJ inadvertently overlooked a piece of evidence or claimed it was unimportant for some reason. Here is the ALJ's full explanation:

> Counsel argued in her [pre-hearing] brief that the assessment from claimant's social worker (21F) establishes listing severity of her mental impairments. 18E. SSR 06-3p and the regulations do not consider a social worker as an acceptable medical source for purposes of diagnoses or listing level determination. 20 CFR 404.1513(d) and 416.913(d).

R. 24. The Commissioner, in its response brief, argues that this explanation was a valid reason to exclude Mr. Benton's opinion from the listing analysis. Defendant's Response at 6, Dkt. 19.

But in reviewing the authorities cited by the ALJ, as well as other authorities, the Court cannot find support for the ALJ's categorical assertion. The ALJ principally relied on SSR 06-3p.[3] This ruling, which has been rescinded but which was in effect for this case, addresses the general question now before the Court—namely, how should ALJs evaluate opinions from

---

[2] The ALJ relied on just two pieces of evidence to reach these conclusions. The first was Plaintiff's written daily function report, and the second was Dr. Thomas's report. Exs. 4E, 7F.
[3] SSR 06-3p discusses 20 CFR §§ 404.1513(d) and 416.913(d), which were the two other authorities the ALJ cited.

healthcare providers who do not qualify as an "acceptable medical sources"?[4] SSR 06-3p first acknowledges that an opinion from an acceptable medical source is needed to establish that the claimant has a medically determinable impairment, and further acknowledges that controlling weight can only be given to an opinion from an acceptable medical source. However, after setting forth these limitations, the ruling then makes clear that opinions from non-acceptable medical sources are relevant for the remaining parts of the decision-making process. Set forth below are multiple excerpts making this general point:

> Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. *However*, information from such "other sources" may be based on special knowledge of the individual and *may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function*.

> \* \* \*

> These regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider relevant opinions and other evidence from "other sources" listed in 20 CFR 404.1513(d) and 416.913(d). With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and *licensed clinical social workers*, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, *are important and should be evaluated on key issues* such as impairment severity and functional effects, along with the other relevant evidence in the file.

> \* \* \*

> Opinions from "other medical sources" may reflect the source's judgment about some of *the same issues addressed in medical opinions from "acceptable medical sources,"* including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

> \* \* \*

---

[4] Everyone agrees that under the regulations then in effect Mr. Benton, a licensed clinical social worker, was not an "acceptable" medical source, although he was a "medical source."

7

> [A]n opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" *if he or she has seen the individual more often* than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

SSR 06-3p (emphasis added). The ruling further notes that opinions from non-acceptable medical sources should be evaluated using the same checklist of factors used to evaluate opinions from acceptable medical sources. In sum, as these four excerpts demonstrate, SSR 06-3p holds that ALJs should consider opinions from medical providers like Mr. Benton in a careful and nuanced way by applying the checklist factors and that ALJs should not categorically reject those opinions based on an all-or-nothing rule that they were not "acceptable" sources. *See also Dogan v. Astrue*, 751 F. Supp 2d 1029, 1038 (N.D. Ind. 2010) ("SSR 06-3p does not indicate that [non-acceptable medical source] opinions should be rejected; but to the contrary, that the opinions from these sources 'are important and should be evaluated on key issues such as impairments severity and functional effects, along with the other relevant evidence in the file.'") (quoting SSR 06-3p).

Listing 12.00 provides additional support for this conclusion. It contains the following statement about what evidence ALJs should consider in evaluating whether the Section 12 listings are met:

> We will consider all relevant medical evidence about your disorder from your physician, psychologist, and *other medical sources*, which include health care providers such as physician assistants, psychiatric nurse practitioners, *licensed clinical social workers*, and clinical mental health counselors.

Listing 12.00C.2 (emphasis added). *See also* Carolyn A. Kubitschek and Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court*, §5:36, p. 740 (2020 ed.) ("In order to show that a claimant satisfies the 'B' criteria of the mental illness Listings, the functional

8

criteria, the claimant may use the testimony of laypeople. The ALJ need not base a determination as to the 'B' criteria on medical evidence alone.").

In sum, the ALJ's assertion that she could simply disregard Mr. Benton's opinion when conducting the listing analysis is not supported by SSR 06-3p or by Listing 12.00 or by any other authority this Court is aware of, and the ALJ's assertion is also at odds with the larger purpose of SSR 06-3p. For these reasons, the Court finds that it was an error.

The only remaining issue is whether this error should be overlooked under a harmless error analysis. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (the harmless error doctrine applies when the court can conclude with certainty that the ALJ would reach the same conclusion absent the error). If one were to make such an argument, one could note that the ALJ later in the RFC analysis gave several rationales for not giving Benton's opinion full weight. Under a principle of transference, one could argue that these rationales carried over to the specific part of the opinion relating to the Paragraph B findings.[5] Although this argument is not illogical on its face, the Court is not persuaded that the harmless error doctrine should be applied in this case.

First, at the most basic level, the Commissioner has not asked that the doctrine be applied. This may be because the Commissioner does not believe there was any error in the first place. As noted above, the Commissioner has essentially stuck by the ALJ's explanation.

Second, although the ALJ did later discuss Mr. Benton's opinion, the ALJ never fully acknowledged the strongest factor bolstering it. Mr. Benton had actively treated Plaintiff over a

---

[5] The Seventh Circuit has stated that an ALJ's decision should be read in its entirety. *See Buckhanon v. Astrue*, 368 Fed. App'x. 674, 678 (7th Cir. 2010) ("There is no requirement of [] tidy packaging[.]").

9

period of more than two years, seeing her on a fairly regularly basis.[6] The visits were typically in the range of an hour long, based on a rough sampling of the record. *See, e.g.*, R. 544 (60-minute visit); R. 545 (50-minute visit); R. 548 (55-minute visit). In other words, these were not merely 15-minute medication management visits. SSR 06-3p, the regulations, and the case law all state that weight should be given to the fact that the person providing the opinion had an extensive treatment relationship. *See, e.g., Derry v. Berryhill*, 756 Fed. App'x. 619, 624 (7th Cir. 2019) ("[The ALJ] failed to explain why Dr. Sunn's 20-month course of treatment deserved less weight than the opinions of consultative examiners who each interacted with Derry one time over a video feed."). The first two checklist factors require consideration of the length and the nature of the treatment relationship. Yet, the ALJ gave this important issue no meaningful consideration. More attention should be paid to it on remand.

Third, Plaintiff has raised some valid questions about one of the ALJ's main rationales for discrediting Mr. Benton. Given the decision to remand this case, which will require the ALJ to re-visit all these issues in more detail, the Court will merely highlight this issue. The ALJ asserted that according to Mr. Benton's medical statement Plaintiff's limitations were "somewhat more extreme than [Mr. Benton's] notes represent." R. 24. If supported by evidence, this rationale would certainly be a valid factor to consider. *See, e.g., Lafayette v. Berryhill*, 743 Fed. App'x. 697, 699 (7th Cir. 2018) ("the ALJ permissibly discredited Dr. Redi's answers to the diagnostic questionnaire because they were inconsistent with his treatment notes"). But as Plaintiff notes, the ALJ did not identify the specific places in the record where the inconsistencies were found, thus making it hard for this Court to verify this claim. The only

---

[6] Neither the ALJ nor the parties have tallied up the exact number of visits, but it is clear from a perusal of the treatment records that Mr. Benton saw plaintiff on many occasions. The precise details can be developed on remand.

10

example given was the assertion that Plaintiff "gets along well in group therapy." *Id.* Perhaps this observation could be a part of a more developed inconsistency argument if bolstered by other examples, but standing alone it is a weak basis for the broad conclusion the ALJ drew.

To be clear, the Court not indicating by these comments that the ALJ's rationales are necessarily wrong. If more fully supported and combined with other evidence, they might provide a sufficient basis for rejecting Mr. Benton's opinion, including the Paragraph B findings. However, as set forth above, such an analysis must include the checklist factors and cannot simply exclude Mr. Benton's opinions regarding the listing analysis.

In sum, the main reason for this remand is that the ALJ improperly excluded Mr. Benton's opinion from consideration in the listing analysis. This error is potentially important given that Plaintiff's counsel, at the hearing, presented the listing argument as the primary basis for finding Plaintiff disabled. At the end of the day, the decision of whether to apply the harmless error doctrine is a judgment call, and not a question that can be answered by exact science. Here, after carefully reviewing the record and the parties' arguments, the Court cannot conclude with certainty that the ALJ's error was harmless.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is reversed and remanded for further consideration.

Date: September 15, 2020   By: _Lisa A. (signature)_
Lisa A. Jensen
United States Magistrate Judge